### MINPECO, S.A.

v.

### CONTICOMMODITY SERVICES, INC., et al. Nelson Bunker Hunt, et al., Appellants.

### No. 86–5648.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 18, 1987.
Decided April 19, 1988.

---

Inez Smith Reid, with whom Paul L. Perito, John R. Wintrol, and Conan N. Louis were on the brief, for appellants.

Janina Jaruzelski, Asst. Counsel to the Clerk, U.S. House of Representatives, of the bar of the Appellate Division of the Supreme Court of New York, 3rd Dept.,

*pro hac vice*, by special leave of court, with whom Stephen R. Ross, Gen. Counsel to the Clerk, and Charles Tiefer, Deputy Gen. Counsel to the Clerk, U.S. House of Representatives, were on the brief, for appellees Brooks and Barash.

Before ROBINSON, STARR, and BUCKLEY, Circuit Judges.

Opinion for the court filed by Circuit Judge BUCKLEY.

BUCKLEY, Circuit Judge:

This case presents questions of congressional immunity under the Constitution's Speech or Debate Clause. In order to prepare their defense in a civil action involving private parties, appellants seek enforcement of two subpoenas duces tecum requiring disclosure of certain information and documents in the possession of a congressional subcommittee. In particular, they seek proof that the text of a sworn statement had been altered by staff prior to publication. We conclude that the subcommittee may refuse discovery of all materials relating to statements taken in the course of an official investigation, irrespective of alleged irregularities.

## I. BACKGROUND

Nelson Bunker Hunt, Herbert Hunt, and Lamar Hunt ("the Hunts") are defendants in a civil case. *MINPECO S.A. v. Conticommodity Services, Inc.*, 81 Civ. 7619 (S.D.N.Y. filed Dec. 8, 1981). The Hunts believe the plaintiffs will introduce, at trial, the sworn statement of Bill L. Bledsoe as published in a report issued by the Subcommittee on Commerce, Consumer, and Monetary Affairs of the House Committee on Government Operations.* They claim to have a stenographer's typescript of the sworn statement which, when compared with the printed version, indicates that substantive changes were made in the latter prior to publication. According to the Hunts, these changes impugn both the ve-

---

* *Silver Prices and the Adequacy of Federal Actions in the Marketplace, 1979–80, Hearings Before a Subcommittee of the Committee on Government* *Operations,* 96th Cong., 2d Sess. app. 3.E. 551–65 (1980).

racity of their testimony before the sub-committee and the legality of their business practices in the silver market in the late 1970's. They also have a deposition from Bledsoe in which he questions the accuracy of the printed version of his testimony. Deposition of Bill L. Bledsoe, Appendix ("App.") at III.D.14. The Hunts therefore seek information with which to test the accuracy of the published statement.

In an effort to ascertain the facts, the Hunts had subpoenas duces tecum served on the Custodian of Records and the Staff Director of the subcommittee. In addition to depositions of the persons named, the subpoenas requested documents relating to six areas:

1) the identity of the stenographer or reporter who took Bledsoe's statement, and of all who had access to the original or subsequent versions;

2) copies of the transcript of the statement, including all copies that differ from the printed statement, and any documents that relate to the alteration of the statement;

3) materials relating to payments made to Bledsoe or to reimbursements of his expenses;

4) all correspondence and communications between Bledsoe and the subcommittee;

5) internal communications of the subcommittee relating to Bledsoe's appearance before it and the statement;

6) correspondence and communications between the subcommittee and other congressional committees, the Commodities Futures Trading Commission, the Securities and Exchange Commission, and any private litigants or their attorneys.

App. at III.A.8–9 and at III.B.8–9.

The subcommittee moved to quash the subpoenas, asserting immunity from discovery under the Speech or Debate Clause ("for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place"). U.S. Const. art. I, § 6, cl. 1. That motion was made before Judge Joyce Hens Green of the U.S. District Court for the District of Columbia because the Hunts had requested that the deposition take place in Washington, D.C. Fed.R.Civ.P. 26(c) ("the court in the district where the deposition is to be taken may make any order ... to protect a party or person ... including ... (1) that discovery not be had").

In an order filed on July 9, 1986, Judge Green accepted the subcommittee's assertion of constitutional immunity and quashed the subpoenas. She rejected the Hunts' argument that the purportedly ministerial act of recording testimony is unprotected by the Clause. She also noted that the proper inquiry is not whether an act can be labelled ministerial or discretionary, but whether the act falls within the legislative sphere. Having determined that transcribing testimony is within that sphere, she concluded that the Speech or Debate Clause protects even illegal acts that may have occurred during the transcription process.

Judge Green also rejected the Hunts' assertion that the Clause's protection applies only when Congress compels a person to testify. The fact that the subcommittee did not subpoena Bledsoe was irrelevant. The judge held that as the statement was elicited by staff in the course of a subcommittee investigation, it is protected. *Order*, Misc. No. 86–0110 (D.D.C. July 9, 1986), App. at II.A.1–6. On September 12, 1986, she denied the Hunts' motion for reconsideration. App. at II.B.1–3. The Hunts filed a timely appeal.

The Hunts present two arguments on appeal. First, they assert that enforcing their subpoenas will not undermine the purposes of the Speech or Debate Clause, which they would limit to three specific situations. (1) The Clause shields members of Congress and their staffs from involvement as parties in civil litigation in order to protect them from executive or judicial hostility. The Hunts argue that such protection is unnecessary here, as there is no congressional party. Brief for Appellants at 16–19. (2) The Clause protects ongoing investigations in order to prevent disruption of congressional business or a diver-

sion of Congress from its legislative tasks. The silver market investigation ended in 1980; thus, allowing discovery now would not disrupt congressional business. *Id.* at 19–20. (3) The Clause protects the independence and integrity of Congress by allowing free debate. Therefore, there is no need to expand protection to *every* act of a legislator or his aides. The alleged alterations are but casually related to legitimate legislative affairs; and to allow altered testimony to remain unchallenged does not uphold the integrity of Congress. *Id.* at 21–22.

Second, the Hunts contend that the information they seek is not privileged because neither the illegal alteration of a sworn statement, nor its subsequent transmission by the subcommittee chairman to the Attorney General with a request that a perjury investigation be initiated, is an activity within the legislative sphere. The Hunts cite a series of cases in which courts have denied immunity for acts not deemed lawful or integral to the legislative process, and they assert that altering sworn testimony is not a legitimate legislative function. Brief for Appellants at 22–38. They also assert that the Speech or Debate Clause does not reach the dissemination of congressional documents outside of Congress. *Id.* at 38–42. Therefore, the Hunts assert, these acts are not protected.

## II. DISCUSSION

■ Before discussing the merits of the Hunts' arguments, we address a preliminary jurisdictional question. Normally, immediate appeals of interlocutory orders involving discovery from non-parties will not be allowed. The general rule does not apply, however, when the court quashing a subpoena is in a different district from the one in which the action is pending. *See* 8 C. Wright & A. Miller, *Federal Practice & Procedure* § 2006, at 30–31 (1970). Because the underlying civil action is pending in the Southern District of New York, this appeal from the U.S. District Court for the District of Columbia is appropriately before us. *Marine Petroleum Co. v. Champlin Petroleum Co.,* 641 F.2d 984, 987 n. 3

(D.C.Cir.1980). We also note that the scope of the immunity the Speech or Debate Clause affords the subcommittee, its members, and staff is a pure question of law that we review de novo.

### A. The Purposes of the Speech or Debate Clause

■ We reject the Hunts' attempt to limit the scope of the Speech or Debate Clause to a narrow set of purposes. First, the Hunts would allay our concerns about authorizing a judicial intrusion into the affairs of the subcommittee by noting that it is not a party to the underlying civil action pending in New York. They appear to assume that Speech or Debate Clause immunity is available only if Congress can demonstrate that it faces the burden of defending a lawsuit that threatens an impermissible interference in congressional business by the judiciary.

The reach of the Clause cannot be limited by so artificial a line. One of its purposes is to shield legislators from private civil actions that "create[ ] a distraction and force[ ] Members to divert their time, energy, and attention from their legislative tasks to defend the litigation." *Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 503, 95 S.Ct. 1813, 1821, 44 L.Ed.2d 324 (1975). A litigant does not have to name members or their staffs as parties to a suit in order to distract them from their legislative work. Discovery procedures can prove just as intrusive.

We are equally unconvinced by the Hunts' argument that enforcement of the subpoenas would impose only minimal burdens on the subcommittee and its staff: as "the Hunts seek no substantive or extensive testimony from a Member of Congress or a current Congressional staff member," the intrusions on their time will be minimal; as the investigation at issue had terminated seven years earlier, "there is no danger of disrupting an ongoing legislative investigation." Brief for Appellants at 20. If the Hunts' theory were correct, each time a subpoena is served on a committee, an initial judicial inquiry would be required to calibrate the degree to which its enforce-

ment would burden the committee's work. Such a consequence would be absurd.

We agree with the broader view of the Clause's purpose that is expressed in *Miller v. Transamerican Press, Inc.*, 709 F.2d 524 (9th Cir.1983). In that case, the question before the court was the propriety of a motion to compel a former congressman, who was not a party to the action, to testify about material he had inserted into the Congressional Record some years earlier. The court denied the motion to compel his testimony even though "the rationale of preventing distraction from legislative duties [was] not applicable," *id.* at 528. It did so because the Clause protects the integrity of the legislative process itself: "Any questioning about legislative acts, even [in the situation of someone no longer a member of Congress], would 'interfere' by having a chilling effect on Congressional freedom of speech." *Id.*

B. Acts within the Sphere of Legislative Activity

■ To use Judge Green's succinct formulation, the critical inquiry, in determining questions of constitutional immunity, "is whether the action at issue, whether legal or not, was undertaken within the 'legislative sphere.'" *Order Denying Reconsideration* (D.D.C. Sept. 12, 1986), App. at II.B.2. This phrasing conforms with Supreme Court teaching: "Congressmen and their aides are immune from liability for their actions within the 'legislative sphere' even though their conduct, if performed in other than legislative contexts, would in itself be unconstitutional or otherwise contrary to criminal or civil statutes." *Doe v. McMillan*, 412 U.S. 306, 312–13, 93 S.Ct. 2018, 2024–25, 36 L.Ed.2d 912 (1973) (citation omitted). The issue, therefore, is not whether the information sought might reveal illegal acts, but whether it falls within the legislative sphere.

■ As the Supreme Court has noted, [t]he acts of authorizing an investigation pursuant to which the subject materials were gathered, holding hearings where the materials were presented, *preparing a report where they were reproduced,*

and *authorizing the publication and distribution of that report ...* were protected by the Speech or Debate Clause. *Id.* at 313, 93 S.Ct. at 2025 (emphasis added). Thus, the process by which a committee takes statements and prepares them for publication clearly qualifies as an activity "within the 'legislative sphere.'" *See also Browning v. Clerk, U.S. House of Representatives*, 789 F.2d 923, 929–30 (D.C.Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 601, 93 L.Ed.2d 601 (1986).

The Hunts nonetheless argue that the alleged alterations in Bledsoe's sworn statement fall within a category of illegal acts that the Speech or Debate Clause will not protect. They rely on dicta in *Gravel v. United States*, 408 U.S. 606, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972), which set forth the parameters of such unprotected behavior:

In *Kilbourn* [*v. Thompson*, 103 U.S. 168, 26 L.Ed. 377 (1881),]-type situations, both aide and Member should be immune with respect to committee and House action leading to the illegal resolution. So, too, in [*Dombrowski v.*] *Eastland,* [387 U.S. 82, 87 S.Ct. 1425, 18 L.Ed.2d 577 (1967) ] as in this litigation, senatorial aides should enjoy immunity for helping a Member conduct committee hearings. On the other hand, no prior case has held that Members of Congress would be immune if they executed an invalid resolution by themselves carrying out an illegal arrest, or if, in order to secure information for a hearing, themselves seized the property or invaded the privacy of a citizen. Neither they nor their aides should be immune from liability or questioning in such circumstances. Such acts are no more essential to legislating than the conduct held unprotected in *United States v. Johnson*, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966).

408 U.S. at 621, 92 S.Ct. at 2625. The Hunts further rely on circuit precedent, *Walker v. Jones*, 733 F.2d 923 (D.C.Cir.), *cert. denied*, 469 U.S. 1036, 105 S.Ct. 512, 83 L.Ed.2d 402 (1984), to elaborate this "execution or implementation theory." Brief for Appellants at 34–38. *Walker* dis-

tinguished between the *"process* leading up to the issuance of legislative directions" and the execution of directions. 733 F.2d at 932 (emphasis original). Even members of Congress have no absolute immunity from liability for carrying out an illegal resolution. *Id.*

This distinction does not help the Hunts. *Browning* made it clear that the Clause covers all the activity leading up to the decision to dismiss an employee whose job related directly to the legislative process. We refused to review the employee's claim of illegal discharge because to do so would have required us "to inquire about matters at the very heart of the legislative process," such as the nature and purpose of the congressional hearings in which the employee was engaged. 789 F.2d at 929–30.

█ For the same reasons, we today decline to command the disclosure of information to test the accuracy of the printed statement. As the preparation of the statement for publication in the subcommittee report was part of the legislative process, that is the end of the matter. It is the responsibility of Congress, not of the courts, to assure the integrity of its reports.

## C. Subcommittee Dissemination of Printed Statement and Correspondence

### 1. *Transmittal to Attorney General*

█ Although never explicitly stated, the Hunts' final argument appears to depend on the proposition that the privilege surrounding the preparation and publication of a congressional document will be forfeit if its subsequent dissemination is not itself protected by the Speech or Debate Clause. That, at least, is the best we can make of appellants' spare references, in the proceedings before the district court and on appeal, to the subcommittee chairman's transmittal of the printed copy of the Bledsoe statement to the Attorney General: *e.g.,* "The act[ ] of ... permitting [the statement] to be used to request a Department of Justice perjury investigation ... [is] not [a] legislative act[ ] entitled to the protection of the Speech or Debate

Clause," Memorandum in Support of Motion for Reconsideration at 5, App. at I.C.10; "the dissemination of an illegally altered sworn Congressional statement outside the legislative sphere means that the Speech or Debate Clause cannot be applied to prevent a Congressional Committee staff member from revealing documents relating to such alteration." Brief for Appellants at 41–42.

Appellants misapply a well recognized principle, namely, that the republication of a privileged statement will not be protected if the republication is effected under circumstances that are beyond the reach of the Clause. "A Member of Congress may not with impunity publish a libel from the speaker's stand in his home district ... even though the libel was read from an official committee report." *Doe v. McMillan,* 412 U.S. at 314, 93 S.Ct. at 2025; *see also* discussion of the Clause in *Chastain v. Sundquist,* 833 F.2d 311, 313–15 (D.C. Cir.1987).

We need not determine whether the transmission of the statement to the Attorney General was constitutionally privileged, however, because the issue here is not whether the *dissemination* of the statement is protected by the Clause, but whether the work of the subcommittee in preparing and publishing the statement is *itself* protected.

In *Gravel,* which appellants cite in support of their assertion that members of a congressional staff may be required to testify as to matters not protected by the Clause, the Supreme Court noted that such testimony could be required "so long as the legislative acts of [Senator Gravel] are not impugned." 408 U.S. at 626–27, 92 S.Ct. at 2628. In *McSurely v. McClellan,* 553 F.2d 1277, 1297 (D.C.Cir.1976), which appellants also cite, we noted: "Although the federal defendants are not immune from inquiry as to dissemination of [documents within a subcommittee's possession] to individuals or agencies outside of Congress, dissemination within the Subcommittee is privileged activity."

These citations make clear that while a member of Congress or of a congressional staff may well be required, in appropriate situations, to testify as to the circumstances of an unprotected act, they may not be compelled to provide evidence that would compromise the protection extended by the Constitution to the legislative process itself. As the preparation and publication of the Bledsoe statement fall within the sphere of the subcommittee's legislative activities, the fact of its transmittal to the Attorney General does not entitle the Hunts to the information they seek.

"Once the legislative act test is met, the principle is absolute," *Miller v. Transamerican Press, Inc.*, 709 F.2d at 529, and it matters not that the subcommittee chairman's act may itself be unprotected. "The immunities of the Speech or Debate Clause were not written into the Constitution simply for the personal or private benefit of Members of Congress, but to protect the integrity of the legislative process by insuring the independence of individual legislators." *United States v. Brewster*, 408 U.S. 501, 507, 92 S.Ct. 2531, 2535, 33 L.Ed.2d 507 (1972).

### 2. *Subcommittee Correspondence with the CFTC, SEC, and Others*

The Hunts' subpoenas requested the production of the following documents that might arguably contain material unrelated to the subcommittee's protected investigatory activities:

5. All documents identifying persons who were provided the original or subsequent copies or versions of the transcript by the Committee.

9. All correspondence and communications between the Committee and other congressional committees, the Commodity Futures Trading Commission, the Securities Exchange Commission and any private litigant or attorneys for private litigants relating to the statement of Bledsoe.

App. at III.A.8–9 and at III.B.8–9. While it is possible that the subcommittee's files might contain documents relating to Bledsoe's statement that were not received or produced in the course of its investigation, we affirm Judge Green's denial of appellants' Motion for Reconsideration for two reasons. First, although the language of the subpoenas is of a relatively broad sweep, appellants have consistently emphasized the narrowness of their objectives, to wit:

> The subpoenas seek testimony and documents relevant to tracing the criminal and ministerial execution of the decision to publish Bledsoe's altered testimony.... Since such activity falls outside the "legitimate legislative sphere" protected by the Speech or Debate Clause, the information sought in the subpoenas, relating solely to the accuracy of the published transcript, is fully discoverable ·and must be furnished by the Subcommittee.

Opposition to Motion to Quash at 21, App. at I.B.21.

> [T]he subpoenas currently at issue seek testimony and documents relevant *only* to the criminal and ministerial execution of the decision to publish Bledsoe's altered testimony and, therefore, require no information concerning a legislative act.

*Id.* at 22, App. at I.B.22 (emphasis added). "No threat to legislative independence" [citing to *Gravel* ] can possibly occur by having a committee staff member respond to questions *concerning the substantial alteration* of volunteered and sworn testimony later published in a committee report and used as a basis for requesting a Department of Justice perjury investigation.

Memorandum in Support of Motion for Reconsideration at 10, App. at I.C.15 (emphasis added). Each of these statements reveals that the subpoenas were issued in pursuit of an impermissible objective, namely, an inquiry into the manner in which the subcommittee had conducted its constitutionally protected legislative responsibilities.

Second, even though the language of the subpoenas is broad enough to encompass documents that do not relate to the Hunts' stated objective, the effect of their literal

enforcement would be to authorize a fishing expedition into congressional files. For a court to authorize such open-ended discovery in the face of a claim of privilege and in the absence of any information to suggest the likely existence of nonprivileged information would appear inconsistent with the comity that should exist among the separate branches of the federal government. Such action would also be inconsistent with Supreme Court decisions that "make clear that the Speech or Debate Clause, designed to preserve the independence and integrity of the Legislative Branch, [is to be] 'read broadly to effectuate its purposes.'" *McSurely v. McClellan*, 553 F.2d at 1284 (quoting from *United States v. Johnson*, 383 U.S. 169, 180, 86 S.Ct. 749, 755, 15 L.Ed.2d 681 (1966)).

We note, in closing, that we do not reach two issues raised or suggested by appellants' arguments: the scope of the discovery that might be available to the Hunts if they had sued a member of the subcommittee or its staff for damages resulting from an unprivileged dissemination of the Bledsoe statement, and the circumstances under which a private litigant might be able to compel the production of documents in congressional files that are not the product of activities within the legislative sphere.

### III. Conclusion

As the information sought by the Hunts is protected by the Speech or Debate Clause, the district court's orders quashing appellants' subpoenas and denying their motion for reconsideration are

*Affirmed.*